**AMERICAN LEGION CLIFTON POST NO. 421, Appellant, v. BOARD OF LIQUOR CONTROL, Appellee.**

Common Pleas Court, Franklin County.

No. 189612. Decided July 1, 1954.

Bernard J. McCluskey, Cleveland, for appellant
C. William O'Neill, Atty. Genl., Kiehner Johnson, Asst. Atty. Genl., Columbus, for appellee.

## OPINION

By BARTLETT, J.

**BOARD OF LIQUOR CONTROL ORDER REVERSED, (REJECTING APPLICATION FOR D-4 PERMIT.)**

This is an appeal under §119.12 R. C. (formerly §154-73 GC), seeking reversal of an order of the Board of Liquor Control rejecting an application for a D-4 Permit, on appeal from an order of the Director of. Liquor Control rejecting an application for such permit.

The record discloses that the Director rejected the application for the reason that the **applicant was "not a reputable organization as required by §4303.17 R. C.,"** since the applicant had permitted beer and intoxicating liquors to be sold or given away at its location without being a permit holder contrary to the provisions of §4301 and §4303 R. C., as shown by arrests resulting in convictions, made by the said Department about November 28, 1953, at the location of said applicant for violations of said §4301 and §4303 **R. C.** (Emphasis ours.)

The Board rejected the application and dismissed the appeal from the order of the Director, **for the reason that about November 28, 1953, the appellant "did openly and notoriously engage in the sale of beer and intoxicating liquor without being the holder of a permit,"** authorizing such sale, as shown by the conviction of certain agents and employees of appellant in violating §§4301.58 and 4399.09 **R. C.** (Emphasis ourt.)

The record shows that the appellant is a unit or Post of the American Legion, chartered by act of the Congress of the United States, and is first in priority on filing for such permit: and, it was stipulated by counsel that the appellant was a bona fide club, organized for the benefit of its members

and maintained by a dues-paying membership. It was further stipulated that on November 28, 1953, three members of Appellant Post were arrested and convicted for violating on the premises of appellant Post, §4301.58 R. C. (R. p. 3.)

One Richard Guidos testified that on the date in question, he was an investigator for the Department of Liquor Control, and that he made purchases of a "shot of Scotch and a bottle of beer" on the premises of the appellant. He testified (R p. 8): "I would have to look that up in a report in Cleveland to be exact," when asked how much he was charged for his drinks. He testified he was alone when he made the first purchase at 10 P. M.; and that he returned about 12:20 A. M. with five others who were officers of the Department, and "ordered another shot and a bottle of beer. I remember I was charged thirty cents for the bottle of beer, and I don't know whether it was forty or fifty for the Scotch." He said he looked in another room where "they had music in there and the whole room was filled up in there." (R. 9); and he went back to the bar "and bought another shot and another bottle of beer, and I paid for them, too," and the other officers entered and three employees of appellant were arrested on the premises for sale of said liquor and beer. He claimed he made purchases from both bartenders, and there were 40 to 50 people in the bar room. He was asked on cross-examination if there were three or four boxes on top of the bar, and he replied, "There was something there, but I didn't pay too much attention." Again he was asked "Were there boxes?" and he replied, "Well, I didn't notice them at the time " Then he was asked "Did you notice them at any other time?," and he replied, "When the boys came in, he called them to Mr. Hall's attention, the supervisor. Mr. Hall asked me if I saw them use those boxes." He was asked, "What were the boxes for?" and he replied, "Well, he discussed that with Mr. Hall." (R. pp. 10-11.) This conversation was claimed to have taken place between the bartender, the witness and Mr. Hall, supervisor of the officers from the Department.

Vernon Allen, Commander of the Post, testified that when they had parties the steward of the club purchased liquor and beer at the retail stores, and the members made donations to the Post through their donation boxes, and a sign on the boxes stated "service by donation only." He testified there were no price lists, and that the supply of liquor and beer was replenished from the donation boxes.

The Commander testified the financial statement covering income at the bar, included not only donations for drinks, but many other donations, including checks for several hundred dollars for other activities of the Post.

The financial report of the Post showed for 1953, net income from the bar, $1378.31, net general income $3927.80, and net for the year $1064.71.

This financial statement showed expenditures of $226.00 on "Americanism," $282.93 on "Athletics," $100.00 on "child welfare," $576.27 on "Children's Christmas Party," $160.24 on "Crile Hospital Entertainment," $741.94 on "Installation Expenses," etc. It also showed income on such affairs, like $250.00 "Children's Christmas Party," etc.

The Roster showed 1578 members, and the Commander testified 980 members were in good standing (R. 16), and their Post was the largest Legion Post in Cuyahoga County and 16th in Ohio. He testified the Post owned its own home, valued on the Tax Duplicate at $72,000.00 free and clear. He testified they took care of 93 families Christmas and wrapped toys for 450 children. They provide teen-age Canteen service for four high schools on Saturday nights—the last one, they had 349 children. They have Boy Scouts on Wednesday night, and have the largest hall on the west side of Cleveland, which is used for civic affairs with only a fee for cleaning.

It was stipulated that appellant filed its application January 8, 1952, for the permit in question.

The Director rejected the application on the ground that the applicant was "not a reputable organization as required by §4303.17 R. C." The Section in question, provides among other things:

"No such permit (D-4) shall be granted or retained until all elected officers of such **organization controlling such club** have filed with the department of liquor control a statement certifying that such club is operated in the interest of the membership of a **reputable organization,** which is maintained by a dues paying membership, setting forth the amount of initiation fee and yearly dues."

This Section also provides:

"Permit D-4 may be issued to a **club** * * *," and "the requirement that a club shall have been in existence for three years in order to qualify for a D-4 permit does not apply to **units of organizations** chartered by Congress * * *."

It will be seen, therefore, that there is a distinction under this statute between the meaning of the terms **"club"** and **"organization."** (Emphasis ours.)

The Liquor Control Act defines the meaning of the term "club," (§§4301.01 and 4303.01 R. C.) but does not undertake to define either of the terms, "organization" or "reputable." The section refers to "such organization controlling such club," and to such clubs as "units of organizations chartered by Congress," such as the American Legion. The finding that

the applicant "is not a reputable organization as required by §4303.17 R. C."; must necessarily, therefore, refer to the American Legion, or at least to Clifton Post No. 421 of said American Legion, and cannot be limited merely to the club itself of said Post. In any event, such a finding is not only preposterous, but is not supported by any evidence whatever upon the closest scrutiny of the entire record of this appeal.

"Reputable," means, "1. Having a good reputation; estimable; honorable, 2. consistent with honorable standing. —* * * reputation * * * the estimation in which a person or thing is held by others; especially, the popular opinion, whether favorable or the reverse; * * *." Funk and Wagnalls "Practical Standard Dictionary" (1946).

Reasonable minds will agree that the popular opinion or estimation of our great patriotic, fraternal and welfare organizations, are not affected let alone determined, by the small indiscretions of the few at the bar in the club rooms, but rather by their laudable programs for human welfare, built upon the tireless efforts of their vast memberships at the cost of thousands of dollars.

On the evening in question, the dance hall of the appellant Post, the largest hall in west Cleveland, was filled by the happy throng of the members and their ladies dancing to the music of the orchestra, while at best some forty or fifty lounged in the vicinity of the bar.

The record shows that the facilities of the appellant Post were used largely for community affairs, such as meetings of the Boy Scouts, North Olmstead Women's Club. Parkview Civic Club, K. of C., Volunteer Order of Police and their auxiliary, F. B. I., the churches, Highway Patrol, Teen-age Canteens from four high schools, Christmas parties for needy kids, etc.

Surely this evidence does not indicate a lack of popular esteem for this Legion Post, the largest in the county  There is no indication that the good people of the neighborhood avoided this Legion Hall on account of any disreputable rumors arising from illegitimate activities of the Appellant Post.

The finding of the Board that the appellant "did **openly and notoriously** engage in the sale of beer and intoxicating liquor * * *," is no more justified by evidence than the finding of the Director that the organization was not **reputable.** (Emphasis ours.)

It was admitted by a member of the Board that a lot of laudable things are carried on by the American Legion; but he commented, "The whole question is whether or not you were selling liquor there."

Attorney General Bricker ruled in 1936 (opinion No. 5839), that §6064-25 GC (§4301.26 R. C.), did not prohibit the Department of Liquor Control from issuing a permit to a person whose permit had been revoked because of a conviction of the permit holder or his agent or employee of violating the penal provisions of the Liquor Control Act, even though such revocation was mandatory under the said section of the act. Under these circumstances, it was pointed out by the then Attorney General, that such "person must be the holder of a permit at the time of conviction;" which is certainly more to be condemned than where the violator was not the holder of a permit, and, consequently, did not violate a trust reposed in him by the Department.

Without expressly referring to all the restrictions contained in the Liquor Control Act pertaining to the issuance of the various classes of permits, it is pertinent to note that §4303.29 R. C. (formerly §6064-17 GC), defines the restrictions on the issuance of permits, one of which is that "no person heretofore convicted of a felony shall receive or be permitted to retain any permit;" but that no prohibition is to be found in the Liquor Control Act against the issuance of any permit, based solely on a violation of the Liquor Control Act, constituting only a misdemeanor, such as the provisions for revocation or suspension of such permits contained in §4301.25 R. C.

From this express limitation as to the issuance of a permit based solely on a conviction of a felony, it might be argued that the principle of statutory construction should apply expressed by the Latin maxim of "expressio unius est exclusio alterius," that is, the express mention by the legislature of certain limitations is to the exclusion of all others. This principle of statutory construction has been recognized by the Supreme Court in many decisions. **Cincinnati v. Roettinger, 105 Oh St 145; Madjorous v. State, 113 Oh St 427; 37 O. Jur. 555, Sec. 295.**

However, in 33 C. J., Sec. 147, page 552, what appears to be the true rule of law as to the issuing of licenses to sell intoxicating liquor is stated as follows:

"But it is usually held that the court or board charged with the duty of issuing licenses is vested with a sound discretion to be exercised in view of all the facts and circumstances of each particular case. But this discretion is a sound judicial discretion and must be based upon solid legal reasons and not exercised arbitrarily or capriciously. * * * Licensing authorities must treat alike all applications possessing the legal qualifications, and they cannot license favored persons and exclude others possessing similar qualifications. * * *"

To the same effect in 37 C. J., Sec. 97, p. 240 under the title of "Licenses":

"The power vested * * * to grant licenses, * * * carries with it, either expressly or impliedly, the power of exercising * * * a reasonable discretion * * *. In exercising this discretion the board or officers should consider all the circumstances against, as well as in favor of, granting the license, and act in accordance with what they believe to be in the interest of the public safety or public welfare, and if for good reasons they are satisfied that the license ought not to be granted, they are justified in refusing it."

These authorities cited, together with the various sections of the Liquor Control Act, lead to the conclusion that the Department of Liquor Control has certain discretion in the issuance of the various classes of permits and has the authority to prescribe certain standards in addition to the express requirements contained in said Act, with the view of effecting the policy therein disclosed. The Liquor Control Act was adopted by the Legislature in order to control the traffic in intoxicating liquors and the Department has been authorized to adopt rules, regulations and orders to accomplish this purpose. It, however, must be kept in mind that the requirements must be reasonable and in keeping with the policy as declared by the Legislature.

It must be remembered that the appellant Post had pending for nearly two years the application for the permit in question, which signified its desire in good faith to submit to the supervision of the Liquor Control Department. It would appear to be more in keeping with the purpose of the liquor Control Act and the accomplishment of the policy therein disclosed, to have welcomed this leading Post of the Great American Legion as the holder of a permit and subject to the supervision of the department, instead of encouraging drinking parties to resort to devises such as the donation or locker systems found in so many clubs of different organizations In other words, if the club desires to be on the Lord's side. it should be welcomed and encouraged, with a view to insuring the maintenance of public decency, sobriety, and good order in a place where intoxicating liquors are bound to be consumed from time to time.

Let us again look to the type of evidence offered by the department and on which is based the finding that the applicant was not a reputable organization. Only one witness was offered in the person of Richard Guidos. an investigator who had been with the Department nearly a year. (R 7.) He was the "snooper" or "stool pigeon" sent into the club to get the evidence. Yet when questioned about the donation boxes

on the bar, his lame reply was, "There was something there, but I didn't pay too much attention. * * * Well, I didn't notice them at the time. * * * When the boys came in, he (bartender) called them to Mr. Hall's attention, the supervisor. Mr. Hall asked me if I saw them use those boxes."

If his recital of events be accepted as true, his own drinking was not confined to making a buy just to procure evidence, as he claims to have purchased three "boiler makers" in about two hours which in bar room parlance is a shot of liquor with a bottle of beer. This would be considered he man drinking in any club.

He knew he was the key witness, and yet his memory was so bad he couldn't recollect the price he paid for the liquor without his report, and his intelligence was so lacking that he came to Columbus from Cleveland without his report, to be a witness against the leading Post of the American Legion in his county. His testimony is so lacking of the elements of trustworthiness as to lead one to suspect his veracity.

Generally the credibility of witnesses should be left to the fact finding agency, such as the Board in the instant case, but in order to affirm the order complained of in this appeal, it is necessary to find that the order is supported by reliable, probative, and substantial evidence, upon consideration of the entire record, which this Court is unable to do; and the Court further finds that the order of the Board is not in accordance with law, and, therefore, sustains the appeal.

Entry accordingly with exceptions by counsel for the Board of Liquor Control.